UNITED STATES DISTIRCT COURT

SOUTHERN DISTRICT OF NEW YORK

NICOS L. DINKINS

                Plaintiff,                                  Docket No.: 19-CV-08447

    -against-                                           Response

THE STATE OF NEW YORK, et al.,

                Defendants.

RECEIVED
SDNY PRO SE OFFICE
2021 MAY 14 PM 2:35

**PLEASE TAKE NOTICE THAT**, Plaintiff Nicos L. Dinkins moves to contest all matters pursuant to Rule 56 of the Federal Rules of Civil Procedure that the Defendant Officer Michael Samora is seeking at the time. The Plaintiff is asking the courts to review the affidavit and all other exhibits and documents brought forth to support his claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

On November 27, 2018, Nicos Dinkins (Plaintiff) was arrested and charged on 4 counts of possession of a fraudulent instrument. He was later brought to the Rockland County Correctional Facility where he was held while he attempted to seek justice. On August 5, 2019, the Plaintiff was later found guilty on all four counts of possession of a fraudulent instrument in the second degree. He then moved to set aside the verdict by filing a 330.30 motion, the motion was denied, and the Plaintiff is currently awaiting sentencing. Currently, the Plaintiff seeks damages pursuant to 42 U.S.C. 1983 against the Defendant Police Officer Michael Samora for

claims of excessive force in violation of the Fourth Amendment to the United States Constitution. In addition, to that claim the Plaintiff claims he was in fact racially profiled, harassed and a victim of an illegal search. The Plaintiff also claims he was beaten by the Defendant Officer Samora and other officers that joined in on this arrest. Despite the fact the Plaintiff was found guilty on the four counts of possession of a fraudulent instrument, that does not negate the intrusion that took place on November 27, 2018.

## STATEMENT OF FACTS

1. On November 27, 2018 the Plaintiff was sitting in the backseat of Jeandany Vilbrun's cab as a paying customer waiting for his girlfriend to finish her chiropractor's appointment. While waiting for his girlfriend the cab driver parked near 46 mariner way which is in the town of Ramapo, New York.

2. The driver parked at this specific location because of the crowded parking lot and he wanted to avoid any accidents that may possibly occur.

3. While Plaintiff was waiting for his girlfriend to finish with her appointment, Adina Blisko who resides at 46 mariner way decided to take multiple photos of him and the driver while we sat inside the cab. It was her testimony that she took two pictures and she sent both pictures to her husband Larry Blisko, who was at work at the time.

4. Once Larry Blisko received the pictures from his wife, she gave him specific instructions. Those instructions were to call the police and tell them about the car that she saw outside her residence, to long for her liking.

5. Larry Blisko followed his wife's instructions and did just that. When Larry called the Ramapo police department, he told the dispatcher that there was a suspicious vehicle parked outside his residence for a certain amount of time, but never did he mention that a crime was taken place.

6. Moments later the defendant Officer Samora arrived on the scene. When the defendant arrived on the scene, he pulled to the rear of the uber with his turret lights on, letting both me and the driver knew he was present.

7. Upon his arrival, please know that Adina Blisko took another picture of the Plaintiff and the Defendant Officer Samora as he arrived on the scene and sent this very same picture to her husband.

8. Once Officer Samora exited his vehicle he approached the driver's window to start his alleged investigation, according to his testimony. When Officer Samora approached the car, he asked the driver for his license and registration. He checked the driver's information right there on his walkie talkie and dispatch told him everything was clean.

9. Despite the driver's license and registration being good the defendant was not satisfied, he decided to question the Plaintiff for his identification to allegedly complete his report.

10. The Plaintiff later discovered that this police report consisted over a dozen errors.

11. However, even though it was the defendant's testimony that there was nothing suspicious going on and the Plaintiff was sitting in the back seat minding his business he still felt the need to identify the plaintiff. After the Plaintiff ignored the Defendant Officer Samara's first attempt to identify him, he instructed the driver to lower the rear driver's window, so he can give an undeniable demand for the Plaintiff's identity.

12. After the defendant violated the Plaintiff's constitutional rights by coercing him to identify himself, the Plaintiff found himself running for his life as the Defendant Officer Samora raced expeditiously around the rear of the car seeking to take some sort of actions

13. The Plaintiff asserts that he never asked the Defendant "what's the problem officer because he didn't have time to do so. Once the Plaintiff saw the Defendant Officer Samora running, his body instantly kicked into fight or flight mood and the Plaintiff ran for his life.

14. While the Plaintiff was running for his life the Defendant Officer Samora deployed his taser multiple times. After striking the Plaintiff with the second taser shot, the Plaintiff found himself laying face first in a driveway right off Mariner way. In a split second several unknown officers joined in and they abused the Plaintiff by kneeing him and delivering other severe blows causing serious damage to the Plaintiff's left knee and left hand.

15. Instead of bringing the Plaintiff to the hospital after the taser deployments, the Defendant Officer Samora brought him to the Ramapo police station. Moments later

the plaintiff could no longer bear the pain in his left knee and the blood coming from the Plaintiff's left hand wasn't slowing up he decided to ask for some medical treatment.

16. He was later brought to Good Samaritan Hospital where he seemed medical treatment on his left hand and left knee but not once did anybody mention that the Plaintiff was tasered.

17. The Plaintiff was eventually brought to the Rockland County Correctional Facility located in New city, New York, where he would reside until it was time to appear before the grand jury. When the Plaintiff finally appeared before the Grand Jury, he was allegedly indicted on four counts of possession of a fraudulent instrument in the second degree.

18. The Plaintiff then went through the pretrial stages and finally the trial stages where he was eventually found guilty on all four counts of possession of a forged instrument in the second degree. The Plaintiff attempted to set aside the verdict by filing a 330.30 motion on the grounds of ineffective assistance of counsel, a constitutional Brady Violation, a directed verdict, along with several other reasons.

19. After the Plaintiff was found guilty on August 5, 2019, his father moments after recorded a conversation of the Plaintiff's trial attorney Jeffrey Schonbrun talking to the jurors. The attorney wanted to get a better understanding as to why they voted the Plaintiff guilty. Juror #7 specifically said she was the last one to vote because the plaintiff never did anything wrong. The attorney then asked why her why she didn't

sway these people to see things her way. Another juror responded that they had to make a decision based off the physical evidence and the arrest.

20. The plaintiff does not assert that he was convicted on the physical evidence, and the physical evidence only that was brought forth in his case.

20. After being tortured mentally for almost twenty months in the Rockland County Correctional Facility the Plaintiff has been out on bail as of July 15, 2020 and is currently awaiting sentencing.

21. Since then the Plaintiff finally got and MRI on his left knee and he discovered that since Nov 27, 2018, that his ACL in his left knee no longer exist and the only solution other then wearing a brace for the rest of his life was to get surgery.

22. Since that discovery the plaintiff has had surgery as of April 27, 2021 and will not be fully healed no sooner than 6-9 months from the day of surgery. So, until then the plaintiff is taking the proper actions to rehabilitate his knee.

### POINT I

### PLAINTIFF'S DISPUTES UNLAWFUL SEARCH CLAIM IS NOT BARRED BY-HECK

1. In this matter the plaintiff disputes that his unlawful search claim should not be barred by the Supreme Court's landmark decision in Heck v. Humphrey, 512 U.S. 477,486 (1994) because the search claim comes after the entire claim the plaintiff has been stressing, which is, the Defendant Officer Samora never showed any proof

that the Plaintiff committed a crime nor did he show proof that probable cause existed.

2. The Plaintiff is disputing this search claim because there are other issues that needs to be addressed and those issues are up to the Court's discretion were Heck v. Humphrey, 512 U.S 477, 486 (1994) does not apply. For example, the evidence in this case did not change and if the Plaintiff had filed this 1983 claim prior to being convicted the defendant would have absolutely no proof that probable cause existed.

3. The Plaintiff dispute's that in the face of a clear and present miscarriage of justice the respondent should not be allowed to hide behind Heck v. Humphrey, 512 U.S. 477,486 (1994) when the Supreme Court stated that this court has the discretion to make a decision based on certain facts and circumstances around the case. The court can not turn a blind eye to this grave miscarriage of justice, and therefore the Supreme Court specifically left that option open for federal judges on the bench.

4. The Plaintiff strongly feels that the question the Court must answer "is whether the defendant violated the Plaintiff's constitutional right and effectuate an arrest where there was no crime committed?"

5. The Plaintiff argues that it is absolutely impossible for the Defendant Officer Samora to make a claim about the Plaintiff's wallet being discarded unless you start with the initial cause, which is the defendant joining in on the racial profiling and harassment that the Blisko family had initiated.

6. The Plaintiff reiterates that the Defendant Officer Samora knowingly took advantage of his authority and used that power to coerce the Plaintiff and the cab driver to do as he pleased even if it meant to violate the plaintiff's constitutional rights.

**POINT II**

1. The Plaintiff disputes that if its under the Court's discretion to determine whether the Defendant Officer Samora's use of force was reasonable then it is without a doubt that the defendant stands in the wrong on this very matter because there was no signs of probable cause.

2. Again, the Plaintiff states that he was simply sitting in the back seat of a cab while his private space was intruded upon by the defendant all because he was allegedly sitting in a car to long not withstanding causing any disturbance nor committing any crime what so ever.

3. The Plaintiff asserts that in order to consider that someone is fleeing from the police, it must be brought to one's attention that they are under arrest. It is the testimony of the Defendant Officer Samora that he never informed the Plaintiff that he was either under arrest or not free to leave. Thus, the Plaintiff was free to leave regardless whether he walked, ran, or anything else because he was not under arrest. So, if the Plaintiff was never informed of neither then it is safe to say he was never legally detained meaning he was in fact free to do as he pleased.

4. The Plaintiff states that if the Court must determine whether the Defendant Officer Samora's use of force violated the Plaintiff's Fourth Amendment rights with the consideration of the three-factor prong then it is without a doubt Defendant Officer Samora stands in the wrong.

5. The Plaintiff wants to view the first prong as it considers the nature and severity of the crime leading to the arrest. Again, the Plaintiff never committed a crime and there was no reasonable suspicion on the part of the defendant to believe a crime occurred or was about to occur which is extremely evident whether you listen to the alleged 911 audio tape, the Defendant's testimony, or the witness Adina Blisko's testimony. The only crime that did occur was when Defendant Officer Samora and the other unknown officers beat the Plaintiff viciously. In addition to that, the Plaintiff was illegally detained the moment the Defendant arrived on the scene with his patrol car lights flashing which suggested to the driver of the cab that he could not leave despite, Plaintiff instruction that he should park further down the block. However, Defendant Samora exited his patrol car and instructed the driver to remain stationary which in that context amounted to a seizure.

6. Next, the Plaintiff would like to view the second prong as it considers whether the suspects pose an immediate threat to the safety of the officer or others. After reviewing the testimony of Adina Blisko, the Defendant Officer Samora, and the driver, it is safe to say the Plaintiff posed no immediate threat to anyone. All the Plaintiff did was sit in the back seat of a cab. The only person that did pose a threat was the Defendant Officer Samora because not only did he feel the need to not explain his reason for detaining the Plaintiff and the driver, but without warning he also dashed around the rear end of the cab to the side the Plaintiff was sitting. Not only did the Defendant's actions frightened the plaintiff, but the plaintiff was actually in fear for his life and began to walk and run away from that potentially violent situation at which time Defendant Samora and several unknown offices accosted Plaintiff and wrestled him to the ground and viciously beat him.

7. Finally, while viewing the third prong as it considers whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Again, it is the plaintiff's testimony that he was never told that he was under arrest nor was he not allowed to leave. Since, Defendant Samora never indicated or mentioned that the Plaintiff was under arrest or being charged with any supposed crime Plaintiff had a constitutional right to freely walk away and not engage in any further activity or conversation with the defendant Samora. Over the course of years, the Supreme Court has since alleged that if a person up's and runs that doesn't mean that a crime has been committed.

8. The Plaintiff does dispute that the Defendant Officer Samora did not have probable cause to arrest him pursuant to the outstanding bench warrant because the Defendant testified that, he has never had an encounter with the Plaintiff. With that being the case how can he act on a warrant of such. Officer Samora testified that the Plaintiff was doing absolutely nothing to alarm him he just wanted the Plaintiffs name for his report which didn't seem to important because that very report consisted of over a dozen errors. The Defendant Officer Samora had absolutely no reason to give an undeniable demand for the Plaintiff's identity. Simply, if he knew the Plaintiff's name, he would have never asked for it.

9. The Plaintiff asserts the downplay of his injuries. As the Plaintiff's medical records would reflect from the day, he was arrested there has been one lie covering the next lie. For example, the Plaintiff was brought to the hospital and as he awaited treatment, he noticed the friendship between the officers and the nursing staff. The Plaintiff noticed similar relations while residing in Rockland County Correctional Facility with the medical staff. The point the Plaintiff is trying to make is his injuries were either hidden or downplayed and each party took part in a shameless cover up.

10. The Plaintiff disputes that his injuries were not minor because after the Plaintiff's release he went for an MRI, and the results came back that the plaintiff had a torn ACL in his left knee.

11. The Plaintiff states that when you view his medical records while he was in the custody of the Rockland county Correctional Facility he witnessed his medical records recommending that he gets a MRI on numerous occasions, but due to the ongoing cover up these things never happened and that's exactly why there is a grave possibility that the nonmention of the taser deployments appear to be a part of the shameless cover up that's taken place.

12. The Plaintiff asserts that handcuffs are not considered to be a sharp object so in order for a handcuffs to be put on someone and cause them a removal of their skin on the back side of their hand and leave an abrasion, there was no doubt about it that excessive force was used on the plaintiff. The Plaintiff suffered from and intense beaten from the Defendant Officer Samora and the other officers who joined him. The medical records would reflect that the Plaintiff's hand was treated by the hospital and the medical staff. Again, the Plaintiff's medical injuries were downplayed by medical staff along with his medical papers were possibly being tampered with by staff to take away from the severity of any injuries he sustained.

13. In fact the injuries were so server the Plaintiff recently had surgery on his left ACL (left knee) as of April 27th, 2021 because of those injuries. If the plaintiff did not get this surgery, he would have no choice but to wear a high-tech knee brace for the rest of his life in order to prevent him from any further injuries.

14.The Plaintiff asserts that he suffered more than physical abuse. He suffered from depression, and server trauma where he attended an extensive amount of therapy and treatment for while residing in the Rockland County Correctional Facility.

15. The Plaintiff asserts that because of this unlawful arrest he has been suffering from that injury since. For example, the plaintiff is currently unable to walk because of this injury. Furthermore, the Plaintiff suffered from side effects from the medication that was given to him to treat his severe case of depression for months on in as he resided in the correctional facility while trying to prove his innocence.

16. Finally, the Plaintiff asserts that the injuries that the Defendant Officer Samora claims does not exist is a complete downplay and he strongly feels that a Court or a jury can easily distinguish that the Plaintiff has been suffering and is still suffering.

**Point III**

1. The plaintiff asserts that the defendant is not entitled to qualified immunity as it pertains to this matter because the defendant knowingly acted outside of his means as an officer.

2. It is the plaintiff's claim that the defendant knowingly acted outside of the law and departmental rules and regulations as such.

**Point IV**

1. The plaintiff asserts that he was racially profiled, and that it was evident throughout his entire case from the moment Adina Blisko took a picture of him. The Defendant constantly says he received a call of a suspicious vehicle from dispatch but when you play the alleged "911 audio tape", the dispatcher said no such thing. The defendant constantly used the word suspicious without ever hearing those words from

dispatch, its his testimony he never spoke to the initial callers nor did he check on them when he arrived on the scene and throughout his entire report. The Defendant Officer Samora used this word suspicious throughout his entire report without his entire report but he never provided facts as to why he labeled the car suspicious.

2. When the defendant arrived on the scene it is the testimony of the driver that he specifically asked the defendant "...is this because we're black?" and the Defendant Officer Samora gave him no response.

3. The Plaintiff, states that during the pretrial stages the officer admits that there was nothing suspicious about a car being legally parked for a period, yet he still had his antennas raised which makes no sense. The Defendant Officer Samora had no reason to have his antennas raised especially because there was never even a crime reported. All that was told to the Defendant was there was a car parked outside for a certain amount of time which the officer didn't care to see if that was even true, but he testifies that he investigated.

4. The Plaintiff states that he was racially profiled from when the caller made that call and the Defendant Officer Samora carried on with the racial profiling when he arrived on the scene. Once the driver was completely in compliance and his identification checked out there was no reason to give the Plaintiff and undeniable demand for his identification. The sole purpose for these actions is because the Plaintiff is an African American male legally parked in a neighborhood where his kind most likely wouldn't reside.

5.  Finally, as the Plaintiff reverts back to audio tape it is spoke upon that not only does his trial attorney mention that this is a case of "Driving while being Black" but you hear the jurors not only agree but goes as far as to say that they think it was a cultural thing.

## POINT V

1.  The Plaintiff disputes that he did file a notice of claim in the month of February 2019. Copies of that claim will be turned over to the courts at this time.

## CONCLUSION

For all the reasons mentioned, the Plaintiff is asking for a summary judgement in the ruling in his favor.

Dated: May 12, 2021
Spring Valley, New York

Nicos Dinkins- Pro Se
57 W. Hickory Street
Spring Valley, NY 10977

/s/Roselina Serrano
Roselina Serano, Esq.
Law Offices of Serrano & Associates, P.C.
Attorney for Defendant Michael Samora
22 South Main Street
New City, New York 10956
(845) 638-2200

